**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **K.K.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )     **CV14-218** |
| | ) |
| **NORTH ALLEGHENY SCHOOL** | ) |
| **DISTRICT,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## OPINION

CONTI, Chief District Judge

Pending before the court are the cross-motions for summary judgment filed by plaintiff K.K. ("K.K.") (ECF No. 65) and defendant North Allegheny School District (the "District") (ECF No. 61).

In her amended complaint, K.K. alleges that the District discriminated against her in violation of her rights under section 504 of the Rehabilitation Act of 1973 ("section 504"), 29 U.S.C. § 794, Chapter 15 of the Pennsylvania Code ("Chapter 15"), 22 Pa. Cons. Stat. § 15, and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132. See Am. Compl. (ECF No. 47). She asserts that the District, beginning in 2012, and continuing through the 2013-2014 school year, refused to modify its transportation program to reasonably accommodate her need for transportation services between her severely disabled son's school and day care facility. Id., ¶¶ 39, 44, and 48. Under that program, the District transported students between schools and day care centers located within its attendance boundaries. Id.,

¶ 20.  K.K. had requested that the District transport her son, S.K., between school and his day care center, which was located outside the District's attendance boundaries because none of the day care centers located within the District's attendance boundaries could accommodate S.K.'s special medical needs.  Id., ¶¶ 19 and 21.  The District refused because the day care facility was located outside the District's attendance boundaries.  Id., ¶ 25.

K.K. seeks summary judgment on all her claims.  She filed a brief in support of her motion (ECF No. 66), a concise statement of material facts (ECF No. 67), an appendix with exhibits (ECF No. 68), a redacted appendix with exhibits (ECF Nos. 71-74), and a reply memorandum of law in support of her motion (ECF No. 83).  In response to K.K.'s motion, the District filed a brief in opposition (ECF Nos. 76 and 84) and a reply to plaintiff's concise statement of material facts (ECF No. 75).

The District also seeks summary judgment on K.K.'s claims against it, arguing that K.K. is barred from recovery because there is no evidence from which a reasonable juror could conclude that it discriminated against K.K. based upon her association with S.K.  The District filed a brief in support of its motion, (ECF No. 62), a concise statement of material facts (ECF No. 63), an appendix with exhibits (ECF No. 64), and a reply brief in support of its motion (ECF No. 85). In response to the District's motion, K.K. filed a response in opposition (ECF No. 77), a brief in opposition (ECF No. 78), and a response to the District's statement of material facts (ECF No. 79).

Together the parties also filed a joint statement of material undisputed and disputed facts (ECF No. 86).

This matter is fully briefed and ripe for disposition.  As more fully explained below, both motions for summary judgment will be denied.

**I. Standard of Review.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The parties must support their respective positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "When confronted with cross-motions for summary judgment, the '"court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard".'" Anderson v. Franklin Institute, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting Schlegel v. Life Ins. Co. of N. America, 269 F.Supp.2d 612, 615 n. 1 (E.D. Pa. 2003); Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998)).

In reviewing the evidence, the court draws all reasonable inferences in favor of the nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004); Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir.

1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

## II. Relevant Facts.

This section reviews the facts relevant to the parties' cross-motions for summary judgment. If the parties agree on a fact, the court will cite to the relevant page and paragraph in the parties' joint statement of material undisputed and disputed facts (ECF No. 86). If a party disputes a fact alleged by the other party, the court will cite to the specific evidence of record that supports the fact in question.

S.K., K.K.'s son, was born in 2006. ECF No. 86 at 16, ¶ 1. K.K. and S.K. resided in the District during the 2012-2013 and 2013-2014 school years and S.K. was initially enrolled in the District in March 2012 to attend kindergarten in the 2012-2013 school year. Id. at 1, ¶ 2; 17, ¶ 7. S.K. has been diagnosed with Cornelia de Lange Syndrome. Id. at 16, ¶ 2. S.K. is blind, deaf, and incapable of basic self-care such as feeding and toileting. Id. at 2, ¶ 4. S.K. also has significant speech and language delays, cognitive impairments, social interaction skills deficits, attentional deficits, gross and fine motor delays, and other adaptive needs. Id.

Child's Way is a day care center for children with special medical needs and has a staff of registered nurses and child care associates. Id. at 3, ¶ 7; 17, ¶ 11. S.K. initially began attending Child's Way in 2011 so that K.K. could work and support their family by working the day time shift at Home Depot twenty-five to thirty-five hours per week. Id. at 3, ¶ 7; 17, ¶ 10;

18, ¶¶ 14-16.  Prior to 2011, K.K. had been working a maximum of twenty hours per week at night and S.K. did not attend day care.  Id. at 17, ¶¶ 8-9.  Child's Way is located 9.7 miles outside the District's attendance boundaries.  Id. at 19, ¶ 19.

Prior to S.K. attending Child's Way, in 2010, K.K. and her ex-husband compiled a list of all the day care centers within the District and called them to see if they would accept S.K.  Tr. of K.K. Dep. (ECF No. 73) at 38-39.  K.K. and her ex-husband were told that none of the day care centers would accept S.K.  Id. at 38-40.  One reason given for not accepting S.K. was that the day care center did not have the licensing to care for a child with medical or special needs.  Id. at 40.  Another reason given was that the day care center was unable to provide S.K. with a one-to-one child to teacher ratio which S.K. required.  Id. at 40-41.  A third reason provided was that the day care center was not staffed to meet S.K.'s medical needs.  Id. at 41.

K.K. contacted all the day care centers located in the District again in 2012, 2013, and 2014.  Each time, she was given the same reasons by these day care centers about why S.K. could not attend the day care centers in the District.  Id. at 42-43.

K.K. first requested transportation between Child's Way and the School for the Deaf[1] (where S.K. was attending an ESY (extended school year) program for the summer of 2011).  Id. at 50.  Initially, the District agreed and provided the requested transportation for the summer of 2011, acknowledging that K.K. "was in a difficult situation."  ECF No. 86 at 4, ¶ 12.  The District made K.K. aware at this time, however, that it would not continue transporting S.K. between Child's Way and his school throughout the school year because Child's Way was not

---

[1] The parties state that the District agreed to transport S.K. between Child's Way and the Western Pennsylvania School for Blind Children for the summer of 2011.  A review of K.K.'s deposition testimony, which the parties cite to as support for this premise, revealed, however, that K.K. testified that during that time period the District provided transportation to S.K. between Child's Way and the School for the Deaf, where S.K. was attending an ESY program.  See ECF No. 73 at 50.

located within the District's boundaries and the District did not want to set a precedent. ECF No. 73 at 63.

K.K. provided the District with a letter dated July 28, 2011, from Dr. Brian Kilpela, M.D. ("Dr. Kilpela"), S.K.'s doctor. ECF No. 86 at 5, ¶ 13. In the letter, Dr. Kilpela stated,

> Due to [S.K.'s] hearing deficit and problems with speech and motor skills, he is not able to attend a "regular" daycare. There were no daycare centers in his school district that either had openings or were able to meet his needs. He is currently attending Child's Way on Penn Avenue. This facility is a Pediatric Extended Care Center. It specializes in offering care to kids with special needs. [S.K.] has a nurse one-on-one. This type [of] care is medically necessary due to his conditions.
>
> . . .
>
> As his physician, I would like to offer that this type of setting and care for [S.K.] is required.

July 28, 2011 Dr. Kilpela Letter, ECF No. 71-3.

K.K. again reached out to the District in May 2012 and requested that transportation be provided by the District for S.K. between the Western Pennsylvania School for Blind Children ("WPSB"), where S.K would be attending kindergarten during the 2012-2013 school year, and Child's Way. ECF No. 86 at 4, ¶ 11. K.K. also suggested that the District could accommodate her transportation request by making "arrangements with a neighboring school district that does pick up students from Child's Way and transports them to the WPSB, and pay the neighboring school district for the additional transportation costs." Id. at 5, ¶ 15. K.K. had heard from other parents of students who attended Child's Way and the WPSB that several other school districts provided transportation. ECF No. 73 at 30. At one point, one of those school districts, Shaler Area School District ("Shaler"), offered to contract with the District to bus S.K. between Child's Way and the WPSB. Id. at 85.

Between May 8, 2012, and May 14, 2012, K.K. and Dr. John DeMann ("Dr. DeMann"), a school psychologist for the District, exchanged a number of emails about K.K.'s transportation request. ECF No. 74-1 at 2-4. The email exchange culminated in Dr. DeMann stating to K.K. that he would be providing Dr. Arlene Wheat ("Dr. Wheat"), the District's Assistant Director of Special Education, with all the relevant information and that Dr. Wheat would then reach out to K.K. about the issue. Id. at 4.

On May 14, 2012, Dr. DeMann and Dr. Wheat exchanged a series of emails concerning K.K.'s request for transportation for S.K. in the mornings from Child's Way to the WPSB. Id. at 2-3. Dr. DeMann explained to Dr. Wheat that he had been told by Donna Liberto ("Ms. Liberto") of the District's transportation department, "that the district's policy prohibits transportation from daycare providers that are outside the district" and that he had told K.K. about this decision. Id. at 3. Dr. DeMann also explained to Dr. Wheat that Brenda from the WPSB had reported to him, "that several other school districts are providing transportation from this daycare (Childs Way) to WPSBC, and suggested that NA could partner with one of them to transport [S.K.]" and that "another district (I think Shaler) has room on their bus to take students from this daycare to WPSBC." Id. at 2-3. Dr. Wheat asked Dr. DeMann to gather information for her to review and inquired, "What are we currently doing, what is the cost, etc." Id. at 2. Dr. DeMann agreed to gather the information for Dr. Wheat and stated, "I don't think we are currently providing any transportation." Id.

In a May 15, 2012 (1:50 P.M.) email from Dr. DeMann to Dr. Wheat (with a "cc" to Ms. Liberto), Dr. DeMann noted in pertinent part:

> I spoke with [S.K.'s] mother and Brenda at WPSBC and copied below (italicized) the proposed plan for his transportation needs. Since we currently transport several NA students to/from WPSBC, the only difference would be the transportation from Child's Way to WPSBC rather than picking him up at his

7

home each morning. There are other students from other districts that transport their students from Child's way to WPSBC, and Brenda suggested working with one of them to coordinate if this is a possibility.

Id. at 1-2. The italicized plan referenced in the email was:

> [K.K.] would like to continue to drop [S.K.] off at Child's Way every morning (Monday through Friday) between 6:30 – 7 am. At this time, transportation taking him to WPSB can pick him up when needed and take him to school. At the close of the school day, [K.K.] would like [S.K.] to be transported to my Home in the North Allegheny district at [K.K.'s home address]. There are multiple children transported from Child's Way to WPSB every morning, and there are also children transported from WPSB back to their homes located with the North Allegheny school district.[]

Id. at 2.

In a subsequent May 15, 2012 (3:24 P.M.) email from Dr. Wheat to Dr. McMann (with a "cc" to Mr. Roger Botti,[2] Ms. Liberto, and Mr. Bob Wagner), Dr. Wheat asked, "Donna, Can we do this? Will it cost anything extra?" Id. at 1. Mr. Wagner emailed (3:27 P.M.) Ms. Liberto and stated, "[w]hat part of 'NO' is getting lost in the shuffle here? Do I need to get Roger involved before someone in the District ends up making promises that are not approved of difficult to retract?" Id. at 6.

In a May 16, 2012 (6:33 A.M.) email from Ms. Liberto to Mr. Wagner, Ms. Liberto stated, "I know…this is gonna open a whole new can of worms … and I think roger [sic] is already involved…." Id. at 5.

In a subsequent May 16, 2012 (11:09 A.M.) email exchange between Mr. Wagner and Mr. Botti, Mr. Botti asked Mr. Wagner where the day care center was located. Id. at 5. Mr. Wagner responded that he thought it was "downtown near Consol." Id.

---

[2] Roger Botti ("Mr. Botti") was the District's Director of Transportation. Suppl. Unsworn Decl. of Guinevere E. Maximo (ECF No. 75-2), ¶ 6. Guinevere Maximo's original and supplemental unsworn declarations, submitted by the District, were executed "under perjury" and substantially in the form required by 28 U.S.C. § 1746. See 28 U.S.C. § 1746 (unsworn declarations may substitute for sworn affidavits where they are made under penalty of perjury and otherwise comply with the requirements of 28 U.S.C. § 1746). Therefore, Ms. Maximo's declarations can be considered as evidence by the court in deciding the pending cross-motions for summary judgment.

In another May 16, 2012 (2:12 P.M.) email from Mr. Botti to Dr. Wheat (with a "cc" to Dr. DeMann and Ms. Liberto), Mr. Botti stated:

> We told this parent no last summer. I am going to take the same positon this summer.
>
> Our recommendation for her was if other Districts were providing the service from daycare to school then she should be able to coordinate with the schools to have the service provided. It is an inconvenience for others on the bus to have to go out of the way to accommodate her.
>
> I also believe we checked with the solicitor and [redacted].

Id. at 1.

In a May 17, 2012 email from Dr. Wheat to Mr. Botti and Dr. DeMann, Dr. Wheat told Dr. DeMann, "John, you have your answer but do not forward this email. Tell [K.K.] the District does not provide that service for anyone and we are unable to do so." Id.

In a May 21, 2012 email from Dr. DeMann to K.K., Dr. DeMann told K.K. that he had spoken to Dr. Wheat. Id. at 8. "Unfortunately the information I gave you a few weeks ago still stands. I was told that the district does not provide this service for any student, and is unable to provide this service at this time." Id.

A series of emails then took place between K.K. and Dr. DeMann between late May 2012 and August 20, 2012, concerning K.K.'s continuing transportation request and S.K.'s Individualized Education Program ("IEP"). Id. at 7-11 and 14-15. In an email sent on July 8, 2012, from K.K. to Dr. DeMann, K.K. stated she is "a single mom with zero external support" and "Child's Way is [her] ONLY option for daycare." ECF No. 86 at 7, ¶ 20. In an email on July 9, 2012, Dr. DeMann told K.K. that he had spoken to Dr. Wheat and "it appears the same decision still stands. The district is responsible for providing transportation for [S.K.] [to/from] WPSBC from/to your home, however, is unable to provide transportation from his daycare

provider." ECF No. 74-1 at 9-10. In an email on July 24, 2012, Dr. DeMann told K.K.: "[a]s I mentioned in my email to you on 7/9/12. The district is responsible for providing transportation for [S.K.] to/from WPSBC from/to your residence, however is unable to provide transportation from his daycare provider (Child's Way)." Id. at 14.

On July 26, 2012, the District issued its proposed IEP for S.K. ECF No. 86 at 2, ¶ 5. It found S.K. eligible for special education, that he required full-time blind or visually impaired and deaf or hearing impaired support, and determined the appropriate placement for S.K. was the WPSB. Id. at 2, ¶¶ 5-6. S.K.'s attendance at Child's Way or any other daycare facility was not required by S.K.'s IEP. Id. at 19, ¶ 20. K.K. did not challenge the validity or appropriateness of S.K.'s IEP. Id. at 19, ¶ 21.

In an email from Dr. DeMann to K.K. dated August 15, 2012, Dr. DeMann told K.K.: "[u]nfortunately there is nothing else I can do or any other avenues to explore at this point. I would encourage you to complete the NOREP[3] and return to us indicating your request for a due process if you feel third party involvement would better represent the issue and provide a recommendation." ECF No. 74-1 at 15.

K.K. provided the District with correspondence dated August 24, 2012, from Erin Colvin ("Ms. Colvin"), RN, MSN, PNP-BC, the Clinical Director of Child's Way. ECF No. 86 at 8, ¶ 23. In the letter, Ms. Colvin explained that Child's Way is a good option for many medically fragile children "due to their consistent nursing care, whereas there is a risk of call-offs and inconsistent schedules with home nursing care" and that other parents in the District "can rely on before and after care facilities for their children when they work. We ask that [S.K.] and his

---

[3]The court understands that "NOREP" is an acronym for "Notice of Recommended Educational Placement."

mother be afforded the same opportunity, but in a setting where nurses can give [S.K.] the medical care that he requires." Id.

At some point prior to the start of the 2012-2013 school year, Mr. Botti contacted Shaler about providing transportation for S.K. between Child's Way and the WPSB. ECF No. 75-2 at 2, ¶ 6. He was advised by Shaler that the cost to the District to transport S.K. as requested by K.K. would have been approximately $70-$72 per day. Id.

On October 26, 2012, Dr. Wheat forwarded to Dr. Malcom Conner ("Dr. Conner"), a Pennsylvania Department of Education employee, an email exchange that had occurred between Dr. Wheat and Dr. Reeves of the WPSB regarding "Transportation To/From Child's Way." ECF No. 74-1 at 17-18; ECF No. 71-5 at 3. On October 23, 2012, Dr. Wheat had emailed Dr. Reeves and explained:

> [S.K.] attends Child Way and his mother has requested a special transportation arrangement to transport [S.K.] to WPSBC but the NA District does not transport students to/from daycare facilities that are outside the District. In addition, it would lengthen the ride for the other students on the van and may cause concern for the parents. I understand you have a van and was wondering if you ever considered transporting children from Child's Way to the WPSBC?

ECF No. 74-1 at 18. Dr. Reeves responded to Dr. Wheat with an email that explained why the WPSB was not considering such a plan and stated, "I imagine you've already determined that collaborating with another district that currently transports from Child's Way to WPSBC is not viable?" Id. at 17-18.

The District created a document titled "Capsule Pieces Regarding [S.K.]" (ECF No. 71-5). The first entry was dated June 6, 2012, was titled "Student Transportation Issue," and provided in relevant part:

> Furthermore, [S.K.'s] mother has requested that the District's transportation pick him up in the morning at his daycare program, Child's Way, and transport him to the WPSB for the 2012-2013 school year. . . . In the afternoon, [S.K.] would

be transported from the WPSB to his home in North Allegheny. As you are aware, the District has several children who are enrolled at the WPSB and are transported to and from the program.

When [S.K.'s] mother first called the District asking that [S.K.] be transported from his daycare program to school, Dr. Wheat explained that while the District has the obligation to transport students to and from an educational program, it has no obligation to transport children to/from daycare programs based on a parent's work schedule. Because [S.K.'s] mother was in a difficult situation for the summer, Dr. Wheat agreed to work with transportation and have special arrangements made just for the summer. Dr. Wheat was clear to [S.K.'s] mother that she would have to work something else out for the school year and would have ample time to do so. [S.K.'s] mother agreed. In the fall, [S.K.'s] mother called the District once again asking for special transportation to and from the daycare. When the District refused, she enrolled him full-time at Child's Way and removed him from an educational pre-school program.

Now that [S.K.] will be transitioning to a school-age program, his mother has once again requested special transportation in the morning. When told that the District does not transport children to and from daycare programs, [S.K.'s] mother became threatening and disrespectful. She has threatened to contact the news media if she does not get the transportation she has requested. Dr. Wheat has contacted Attorney Michael Brungo, and in a conversation with Mr. Brungo and Mr. Lucas [redacted]. Dr. Wheat has also contacted Mr. Botti who is reluctant to approve transportation arrangements to/from daycare programs as many requests are made yearly for such arrangements. Further, Mr. Botti is concerned that by allowing special transportation arrangements in this case, it will open the District to providing these arrangements to any parent who requests such an accommodation.

[S.K's] mother has further requested that the District make arrangements with a neighboring school district that does pick up students from Child's Way and transports them to the WPSB, and pay the neighboring school district for the additional transportation costs. It is important to note that yearly tuition to the WPSB is $34,311.28 and represents 40% of the total cost of the tuition. The other $51,000 of the tuition is paid by the State.

ECF No. 71-5 at 1-2. The second entry was dated September 26, 2012, was titled "Response to

Parent Letter," and provided in relevant part:

> Dr. Wheat, Ms. Maximo,[4] and Dr. DeMann have been attempting to bring resolution to the concerns of [K.K.] regarding her son, [S.K.]. As you are aware, [S.K.] has multiple disabilities and the NASD has recommended the Western Pennsylvania School for Blind Children (WPSB) . . . . Although [K.K.] continues to vilify the Special Education Department, the major issue has nothing to do with [S.K.'s] recommended educational program. The major concern is transportation to/from the specialized daycare. In fact, [K.K.] has stated that the reason [S.K.] needs to attend this specialized daycare as referenced in the letter from Dr. Kilpela is to accommodate her work schedule. Dr. Wheat has explained to [K.K.] that the NASD is responsible for transporting her son to/from his home and to/from his school. The District does not transport students to/from daycare facilities that are located outside the school district. In addition, [S.K.'s] request to have her son picked up at Child's Way disregards the impact of the length of the transportation ride of all the other students currently on the same van. [K.K.'s] solution is for the NASD to pay the Shaler School District, who does send a van to/from Child's Way, to transport [S.K.].
>
> . . . If the District were to provide transportation for [S.K.] to/from a daycare that is outside the District borders, then in all fairness to those parents who have children in daycare programs outside the district borders, their children should also be afforded this transportation option. If this were to occur, Mr. Botti is concerned that this would significantly increase transportation costs for the District.
>
> . . .
>
> . . . Until the issue of transportation is resolved either by agreement or through a due process hearing, [S.K.] will remain within the early intervention program for his educational services.

Id. at 2-3. The third entry was dated October 17, 2012, was titled "Special Transportation Request," and provided:

> As you are aware, [K.K.] has requested that special transportation be provided to take her son from Child's Way, a specialized daycare provider, to the Western Pennsylvania School for the Blind. At an IEP meeting to discuss this issue, [K.K.] requested a due process hearing. However [K.K.] has not, to date, filed the required paperwork with the Office of Dispute Resolution to initiate the process.

---

[4] For the school year 2012-2013, Guinevere Maximo ("Ms. Maximo") was the District's Supervisor of Special Education. ECF No. 64-3, ¶ 2.

Last week, Dr. Wheat sent a letter to [K.K.] stating that if she did not file the paperwork, the District was obligated to do so on her behalf. Instead of contacting the Office of Dispute Resolution, [K.K.] contacted the Pennsylvania Department of Education to file a complaint against the District. Dr. Wheat was contacted by Dr. Malcolm Connor from PDE to discuss the complaint. Dr. Wheat explained to Dr. Connor that the District was aware of its obligation to provide transportation to [S.K.] to/from his home and to/from the Western Pennsylvania School for the Blind. However, [K.K.] was requesting that the District provide transportation to/from Child's Way, a daycare facility which was not the District's obligation. As a note, [K.K.] told Dr. Connor that Child's Way was not a daycare. Dr. Connor looked on the Child's Way website where the program was described as a daycare facility. Dr. Connor understood and agreed with the District's position and obligation to provide transportation. Dr. Wheat explained that adding another stop along the way would also increase the time that the other students were on the bus, which may trigger complaints from other parents due to the additional length of the ride. Dr. Connor was sending an email to [K.K.] regarding his conversation with me, and to reiterate the District's position and obligation. In addition, Dr. Connor was going to remind [K.K.] that she has an obligation to file for the due process hearing.

Id. at 3. The fourth entry was dated November 28, 2012, was titled "[K.] Mediation," and provided in relevant part:

On November 19, 2012, the Mediation Hearing was held for [S.K.] . . . [K.K.] (mother) was accompanied by two educational advocates although one participated by phone.

We were not able to reach Resolution as it is the District's position that it is not the District's responsibility to transport students to/from daycare unless the daycare is within the District borders. The parent raised an interesting point that this policy may be a violation of the Americans' with Disabilities Act (ADA) since the daycare facilities within the District borders do not take children with extensive medical needs as [S.K.]. However, the District has not talked with each of the daycare facilities, but the parent is willing to get rejection letters from each one. Gwynn Maximo does know of one daycare that takes students with disabilities but [it] closed its doors last year. Dr. Wheat has requested additional information from Mr. Botti regarding the daycares that the District does provide transportation to and from. There is past practice regarding transportation to daycares within the District boundaries. However, Dr. Wheat believes the parent will argue her case for transportation based on this discrimination claim. It is unknown how a hearing officer will interpret this specific case. However, if the District wins the due process then past practice will be upheld regarding transportation to daycare facilities and if it loses, transportation arrangements for [S.K.] would only be specific to the order delivered by the Hearing Office. This would eliminate the concern of providing

14

transportation to any daycare facility for any child upon request of a family, which would be a costly endeavor and is Mr. Botti's concern.

Dr. Wheat and Ms. Maximo believe that [K.K.] will now file for a Due Process Hearing. . . .

Id. at 4. The fifth and final entry was dated April 17, 2013, was titled "Office of Civil Rights Complaint," and provided in relevant part:

On April 11, 2013, the District received a letter from Attorney Jeffery J. Ruder, Ruder Law, filing a complaint with the Office for Civil Rights. . . .

In 2011, the student began attending Child's Way, a day care for medically fragile children operated by the Children's Home and Lemieux Family Center due to medical necessity while the mother attended work. In July of 2012, the District conducted a re-evaluation to determine the student's needs for programming since he was transitioning from early intervention services to school age programs. At the IEP meeting held on July 26, 201[2], the District recommended educational placement at the Western Pennsylvania School for Blind (WPSB). The mother agreed to the educational placement, but requested transportation services to and from Child's Way, this District denied this request. In a legal opinion provided by Mr. Michael Brungo on July 31, 2012 [redacted].

The twist in this issue is that the parents are requesting that the District not transport the child from home, but rather transport the child from a day care center located outside of the district boundaries. This has been the District's position. In the present case, the transportation requested is neither necessary to some integral part of the student's special education needs or reasonably calculated to advance the goals of the student's IEP, but requested solely to accommodate the needs of parents. The child does not need to attend the day care facility as part of his IEP.

The District conducted a second re-evaluation to determine the need for extended school day services. The Re[e]valuation Report dated November 7, 2012, concluded that these service recommendations can be provided within the typical school day and do not necessitate an extended school-day program.[]

Id. at 4-6.

Due to the lack of transportation from Child's Way to the WPSB, and K.K.'s inability to arrange for private transportation of S.K. to the WPSB, S.K. did not attend school for the 2012-2013 or the 2013-2014 school years. ECF No. 86 at 11, ¶ 33.

For the 2012-2013 school year, the District transported both disabled and nondisabled children to and from day care facilities located inside the District's boundaries. ECF No. 64-3 at 1, ¶ 3. For the 2012-2013 school year, no District students, either disabled or nondisabled, were transported to day care facilities outside of the District under any circumstances. Id. at 1, ¶ 4.

For the 2012-2013 school year, two students were transported by the District to the WPSB. ECF No. 86 at 11, ¶ 32. Child's Way is located 1.69 to 1.78 miles from the WPSB. Id. Both students (students A and B) have or had significant medical histories requiring the support of a nurse to ride the bus. ECF No. 75-2 at 2, ¶ 3. Student A's medical history is significant for the amputation of her right leg above the knee and mild lupus. Id. at 2, ¶ 4. Student A had a tracheostomy and g-tube and utilized a ventilator. Id. Student A is followed by a neurologist, who describes the condition as "either thalamic storms in the area of the brain that was injured" or seizures. Id. Student A required ongoing monitoring of the heart rate and oxygen levels. Id. Student A's communication is limited. Id.

Student B's medical history is significant for seizures. Id. at 2, ¶ 5. Student B's diagnosis included intractable seizures, hypotponia, cortical visual impairment, microcephaly, server intellectual disability, and optic atrophy. Id. Student B's medical history is also significant for esophageal reflux, constipation, eczema, failure to thrive, global developmental delays, and multiple hospitalizations mostly due to seizure activity and feeding problems. Id. Student B required constant care and medical attention. Id.

In the 2012-2013 school year, the District's van route for the WPSB carrying students A and B took the van onto Interstate 279 to Interstate 376, Forbes Avenue and North Bellefield Avenue. Id. at 1, ¶ 1. If the District's WPSB bus route were to service Child's Way day care facility on Penn Avenue while maintaining this regular main route, the bus would need to travel

another 1.7 miles past the WPSB and then return.  Id.  This round trip would be approximately 3.5 miles and would take a minimum of twenty-five minutes due to traffic in that area during morning rush hour.  Id.

To service Child's Way directly, the District would need to change the District's route described above.  Id. at 1, ¶ 2.  It would have re-routed the van to travel on Route 8 to Route 28, across the 40th Street bridge to Penn Avenue, where Child's Way is located, and from Child's Way to the WPSB.  This way is approximately one mile longer in distance.  Id.  During the 2012-2013 school year, the time for the bus to travel this route would have been significantly longer due to the construction on Route 28 and the traffic from the day care facility to the WPSB.  Id. at 1-2, ¶ 2.  Similarly, the route time for pickup would have been earlier due to the construction and added time from the day care facility to the WPSB.  Id. at 2, ¶ 2.

In deciding to refuse K.K.'s request for transportation for S.K., the District considered the amount of time it would take for the District's van to service Child's Way to and from the WPSB, the medical histories of Students A and B who would have been on the bus with S.K, and the cost to the District to have S.K. transported on Shaler's bus. ECF No. 75-2 at 2, ¶ 7.

K.K. is not aware of another situation for which the District provided the same transportation that she requested.  ECF No. 86 at 19, ¶ 24.

As a result of the District's refusal to transport S.K. between Child's Way and the WPSB, "it was very stressful [for K.K.] at the time, causing anxiety, not able to sleep;" "just a lot of anxiety."  ECF No. 73 at 89.  K.K. sought therapy and psychiatric services to treat her anxiety. ECF No. 86 at 12, ¶ 37.  Prior to this time, K.K. had seen a therapist and psychiatrist for depression related to marital issues.  ECF No. 73 at 93.

17

The District is a recipient of federal financial assistance and is subject to the requirements of section 504 of the Rehabilitation Act, Title II of the ADA, and Chapter 15 of the Pennsylvania Code.  ECF No. 86 at 2, ¶ 3.

## III. Discussion.

### A.  Applicable Law.

Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...."  29 U.S.C. § 794.  A recipient of federal funds that operates a public elementary or secondary education program "shall provide non-academic and extracurricular services and activities in such manner as is necessary to afford handicapped students an equal opportunity for participation in such services and activities."  34 C.F.R. § 104.37(a)(1).  "Nonacademic and extracurricular services and activities may include counseling services, physical recreational athletics, *transportation,* health services, recreational activities, special interest groups or clubs sponsored by the recipients, referrals to agencies which provide assistance to handicapped persons, and employment of students, including both employment by the recipient and assistance in making available outside employment."  Id. at § 104.37(a)(2) (emphasis added).  Accordingly, a school district may not discriminate against a disabled student in the provision of transportation with respect to nonacademic services, meaning the school district must afford disabled and nondisabled students an equal opportunity to receive transportation for nonacademic purposes.

"Pennsylvania has 'implement[ed] the statutory and regulatory requirements of § 504' at the state level through the enactment of Chapter 15.  K.K. ex rel. L.K. v. Pittsburgh Pub. Sch.,

590 F. App'x 148, 153 n.3 (3d Cir. 2014) (quoting 22 Pa.Code § 15.1). "Because Chapter 15 does not preempt or expand the rights and liabilities under Section 504, the court will treat Chapter 15 as coextensive with Section 504." A.W. ex rel. H.W. v. Middletown Area Sch. Dist., Civ. Action No. 13-2379, 2015 WL 390864, at *15 (M.D. Pa. Jan. 28, 2015); see K.K., 590 F. App'x at 153 n.3.

Title II of the Americans with Disabilities Act provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under Title II of the ADA, a public entity has an affirmative duty to make reasonable modifications in its policies and programs to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7). Section 35.130(b)(7) provides:

> (7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

Id. "'[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same'." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 275 (3d Cir. 2014) (quoting Ridley Sch. Dist. v. M.R., 680 F.3d 260, 283 (3d Cir. 2012)).

In Alexander v. Choate, 469 U.S. 287 (1985), a decision interpreting section 504 of the Rehabilitation Act, the Supreme Court explained, "while a [recipient of federal funds] need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones" so to give "meaningful access" to the service, program, or activity in question. Alexander, 469 U.S. at 301 (citing Southeastern

Comm. College v. Davis, 442 U.S. 397 (1979). The regulations applicable to Title II of the ADA similarly require that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7)(i).

As explained by the appellate court in Muhammad v. Court of Common Pleas of Allegheny Cty, Pa., 483 F. App'x 759 (3d Cir. 2012):

> A plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA. See Wis. Cmty. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 751 (7th Cir.2006) (en banc). To make out such a claim, a plaintiff must show that the accommodation he seeks is reasonable, see Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 783 (7th Cir.2002), i.e., that it is "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

Muhammad, 483 F. App'x at 763. "[T]he plaintiff first bears the burden of articulating a reasonable accommodation. The burden of proof then shifts to the defendant, who must establish that the requested relief would require an unduly burdensome or fundamental alteration of state policy. . . ." Frederick L. v. Dep't of Pub. Welfare of Com. of Pa., 364 F.3d 487, 492 (3d Cir. 2004). "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." Easley by Easley v. Snider, 36 F.3d 297, 305 (3d Cir. 1994); see also Crowder v. Kitagawa, 81 F.3d 1480, 1485 (9th Cir.1996) (holding in a Title II ADA case that whether a proposed accommodation is "reasonable" is a question of fact)); Anderson v. Franklin Institute, 185 F.Supp.3d 628, 650 (E.D. Pa. 2016) ("'the determination of whether a particular modification is "reasonable" involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in

question and the cost to the organization that would implement it'") (quoting Staron v. McDonald's Corp., 51 F3d. 353 (1995); Alboniga v. School Bd. of Broward County Fla., 87 F.Supp.3d 1319 (S.D. Fl. 2015) ("The analysis, under Title II of the ADA as under the FHA, must focus only on whether the requested accommodation is reasonable under the specific circumstances particular to the individual in question.") (citing Terrell v. USAir, 132 F.3d 621, 626 (11th Cir.1998) ("Whether an accommodation is reasonable depends on specific circumstances.").  In Strathie v. Department of Transportation, 716 F.2d 227 (3d Cir.1983), a decision involving section 504 of the Rehabilitation Act, the court concluded that "[a] handicapped individual who cannot meet all of the program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds." Strathie, 716 F.3d at 231.

As explained in the court's opinion that addressed K.K.'s motion for leave to file an amended complaint:

> A right to relief under the Rehabilitation Act and the ADA is not limited to disabled persons. "It is widely accepted that under both the RA and ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." McCullum v. Orlando Regional Healthcare Sys., Inc., 768 F.3d 1135, 1142 (11th Cir. 2014) (citing Addiction Specialists, Inc. v. The Twp. of Hampton, 411 F.3d 399 (3d Cir. 2005)); Doe v. Cnty. of Centre PA, 242 F.3d 437, 447 (3d Cir. 2001) ("The protections of the ADA extend to 'qualified individuals' who are discriminated against because of their relationship or association with individuals who have a known disability."). A plaintiff asserting an associational discrimination claim under the Rehabilitation Act and Title II of the ADA must [establish]:
>
>> (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination.

Schneider v. Cnty. of Will, 190 F.Supp.2d 1082, 1091 (N.D. Ill. 2002) (citing 28 C.F.R. § 35.130(g)).

A parent may be regarded as having the kind of relationship to his or her disabled child that permits him or her to assert an associational discrimination claim under the ADA. See e.g., Doe, 242 F.3d at 446–47 (permitting associational discrimination claims under Title II of the ADA by parents of an adopted child who was HIV-positive and noting "the protections found in the ADA and in the Rehabilitation Act are interpreted similarly, and, in this case, are identical."). A parent may, therefore, assert an associational discrimination claim against a school district if the school district discriminates against him or her because of his or her association with a disabled child. See e.g., Eskenazi–McGibney v. Connetquot Ctr. Sch. Dist., 84 F.Supp.3d 221, 230 (E.D.N.Y. 2015) (denying defendant's motion to dismiss because "the amended complaint alleges that RM and JM were denied access to Celaberti and to the school grounds based on their association with JEM, their son with a disability").

S.K. v. N. Allegheny Sch. Dist., 146 F. Supp.3d 700, 711–12 (W.D. Pa. 2015) (footnote omitted).

**B. Legal Analysis of the District's Motion for Summary Judgment.**

In support of its motion for summary judgment, the District contends that summary judgment must be granted in its favor because there is no evidence from which a reasonable juror could conclude that it discriminated against K.K. based upon her association with S.K., as required to establish the third element of K.K.'s associational discrimination claims. Def.'s Br. in Supp. of its Mot. for Summ. J. at 5, ECF 62 at 5. In support, the District posits that it is undisputed that: (1) K.K. was treated in the same manner as all parents residing in the District with either disabled or nondisabled children; i.e. the District only transported students, both disabled and nondisabled, to day care facilities located within the District's boundaries, and did not transport any students, disabled or nondisabled, to day care facilities located outside the District's boundaries; and (2) the basis for the denial of transportation for S.K. was because Child's Way was located outside the boundaries of the District. Id. at 5. The District concludes that because "there is no evidence of record that the association of Plaintiff with S.K. had any

involvement in the decision of the District to deny Plaintiff's request to transport S.K. to a daycare facility outside of the boundaries of the District," summary judgment must be granted in its favor.  <u>Id.</u> at 6.

In response to the District's motion for summary judgment, K.K. contends that the undisputed evidence of record establishes that the District discriminated against her based upon her association with her son, S.K. in two ways: (1) by failing to conduct an individualized inquiry into whether K.K. could access the benefit of the District's transportation policy if it provided her with a reasonable accommodation; and (2) by failing to provide a reasonable accommodation to its transportation policy.  Pl.'s Mem. of Law in Op. to Def.'s Mot. for Summ. J. at 3, ECF No. 78 at 3.

In reply to those arguments by K.K., the District reiterates the arguments it made in its original supporting brief.  Def.'s Reply Br. in Supp. of its Mot. for Summ. J. at 2, ECF No. 85 at 2.  Additionally it argues that it was not required to provide a modification to its transportation policy because K.K. did not establish that it was medically necessary for S.K. to attend a day care facility outside the District's boundaries.  <u>Id.</u> at 2-3.  It contends that there is evidence of record to support its decision to deny K.K.'s transportation request.  The District asserts that determination was the result of a meaningful, individualized inquiry undertaken by the District because it considered the additional time that the other medically fragile children on the bus would have to spend on the bus and that Shaler could transport S.K. at a cost of approximately $70-$72 per day.  <u>Id.</u> at 3-4.  The District argues that the accommodation requested would have resulted in an undue burden and a fundamental alteration of the practice of not transporting students to day care facilities outside the District's boundaries.  Specifically, the accommodation would have resulted in an additional cost to the District or an inconvenience to the already existing

transportation of students.  Id. at 5-7 (citing Timothy H. v. Cedar Rapids Community Sch. Dist.,

178 F.3d 968 (8th Cir. 1999)), ECF No. 85 at 5-7.

In granting K.K.'s motion for leave to amend the complaint to state her own claims

against the District, the court held in relevant part:

> With respect to the third element [of K.K.'s associational discrimination claim],
> i.e., the District discriminated against her because of her association with S.K.,
> K.K. plausibly alleged that the District discriminated against her based upon
> S.K.'s disabilities by refusing to make a reasonable modification in the
> transportation service to transport S.K. between Child's Way—which was outside
> the school's attendance boundaries—and the WPSB. As discussed above, under
> Title II of the ADA, a public entity has an affirmative duty to make reasonable
> modifications in its policies and programs to avoid discrimination on the basis of
> disability. 28 C.F.R. § 35.130(b)(7). The allegations in the amended complaint
> and the reasonable inferences drawn therefrom plausibly show that the District
> knew K.K. could not participate in the transportation program because of S.K.'s
> disabilities but refused to make a reasonable modification in its program to afford
> K.K. access to the program equal to that of parents with nondisabled children.
> (ECF No. 34-1 ¶¶ 18-19, 22-25.) Under those circumstances, K.K. set forth
> factual allegations in the amended complaint to plausibly show that the District
> discriminated against her because of her association with S.K.

S.K., 146 F. Supp.3d at 717–18 (emphasis in original); see id. at 715 ("[t]he foregoing

allegations and the reasonable inferences drawn therefrom plausibly show that the District

knew K.K. could not participate in the transportation program because of S.K.'s disabilities but

refused to make a reasonable modification in its program to afford K.K. access to the program

equal to that of parents with nondisabled children. In other words, the allegations in the proposed

amended complaint show that the District invaded K.K.'s legally protected interest not to be

discriminated against based upon S.K.'s disabilities by refusing to reasonably modify the

transportation program to give her full and equal access to the transportation program.").

Given S.K.'s inability to attend a day care center within the District's attendance

boundaries, if the District refused when requested by K.K. to make a reasonable modification to

its transportation program to afford K.K. access to the program equal to that of parents with nondisabled children, then a reasonable jury could find that the District discriminated against K.K. due to her association with S.K. in violation of section 504 of the Rehabilitation Act, Chapter 15, and Title II of the ADA.  See Smith v. Twp. of Warren, No. CV 14-7178, 2016 WL 7409952, at *11 (D.N.J. Dec. 22, 2016) (concluding that "[e]ven a facially neutral policy may violate the Rehabilitation Act, if the agency instituting that policy fails to make a 'reasonable accommodation to the "known physical or mental limitations" of otherwise qualified individuals'.  Therefore, . . .  Plaintiff may satisfy the causation element of the Rehabilitation Act by alleging that William and Mary Smith were excluded from full use of these shelters because they were unable to access and/or utilize them solely due to their respective disabilities. ") (quoting Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1384 (3d Cir. 1991); AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11, 538 F.Supp.2d 1125, 1140 (D. Minn. 2008) (holding "[t]he failure to provide reasonable accommodations—including the failure to provide a reasonable accommodation by modifying a disability-neutral policy—can indeed constitute disability discrimination in violation of the ADA, the Rehabilitation Act, and the [Minnesota Human Rights Act]").

Turning to the evidence of record viewed in a light most favorable to K.K. as the nonmoving party, the court concludes that there are numerous genuine issues of material fact that preclude the District's motion for summary judgment being granted.  Considering Dr. Kilpela's letter is in its entirety, as well as K.K.'s testimony at her deposition with respect to the varied reasons for why she and her ex-husband were told that none of the day care facilities within the District's boundaries were able to accommodate S.K.'s needs, there is sufficient evidence of

record to allow a reasonable factfinder to find that it was medically necessary for S.K. to attend a day care facility outside the District's boundaries. <u>See</u> ECF No. 71-3 and ECF No. 73 at 38-43.

It is not disputed that if a plaintiff has requested a modification of a program as required by Title II of the ADA and the RA, then an "individualized inquiry" must be made by the defendant "to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661, 688 (2001); <u>School Bd. of Nassau Cty, Fl. v. Arline</u>, 480 U.S. 273, 287 (1987). In light of the email exchange that took place between various persons employed by the District and the capsule document authored by a District employee, there is a genuine issue of material fact concerning whether the District conducted a meaningful individualized inquiry into K.K.'s requested modification of its transportation program. A reasonable factfinder could conclude that the District's focus was on cost and not setting a precedent for having to transport students to and from day care facilities outside the District, and did not consider if there was any way it could reasonably accommodate K.K.'s need for transportation for S.K..

A reasonable factfinder also could conclude that the requested modification in the transportation service, transporting S.K. between Child's Way—which was outside the school's attendance boundaries—and the WPSB, would not have resulted in an undue burden or a fundamental alteration of the practice of not transporting students to day cares outside the District's boundaries. A reasonable factfinder could conclude that requiring the District to transport S.K. to and from Child's Way to the WPSB is not a fundamental alternation to the nature of the District's program because the program at issue is designed to provide transportation between the school and a day care program as needed by working parents such as

K.K.  A reasonable factfinder also could conclude that paying Shaler $70-$72 a day to have S.K. transported on the Shaler bus or requiring students A and B to travel the additional time and distance between Child's Way and the WPSB daily would not result in an undue financial or administrative burden to the District.

For all the reasons stated above, it will be for a reasonable factfinder to determine whether the District's refusal to make a modification to its transportation program given S.K.'s inability to attend a day care facility within the District's boundaries and transport S.K. between Child's Way and the WPSB was reasonable.  Defendant's motion for summary judgment with respect to K.K.'s section 504 of the Rehabilitation Act, Chapter 15, and Title II ADA claims against it will be denied.

**C.  Legal Analysis of K.K.'s Motion for Summary Judgment.**

K.K. argues that summary judgment should be granted in her favor on all her discrimination claims against the District.  Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. at 5, ECF No. 66 at 5.  K.K. first contends that the record establishes that she is a protected individual under section 504 of the Rehabilitation Act (and by implication Chapter 15) and Title II of the ADA based upon her logical and significant relationship with her son, S.K.  Plaintiff's Supporting Brief at 6-7, ECF No. 66 at 6-7.  Second, K.K. argues that the record establishes that the District discriminated against her because of her association with S.K. in that it failed to conduct an individualized inquiry into whether she could have accessed the transportation had it offered a reasonable modification to its policy.  Id. at 8-11 (citing Singh v. George Washington U. School of Med. and Health Sciences, 508 F.3d 1097, 1105 (D.C. Cir. 2007); Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cr. 1995)).  Third, K.K. argues that the record establishes that she suffered concrete emotional and economic harm as a result of the District's

failure to transport S.K. between Child's Way and the WPSB for two school years. That harm from the denial of access to the transportation service equal to that of parents with nondisabled children, was that she suffered emotional distress, and required extensive therapy to address the stress and hardship caused by the District's unlawful actions. Id. at 11-12. Fourth, K.K. argues that the District acted with deliberate indifference when it discriminated against her, and therefore, she is entitled to recover compensatory damages for both economic and noneconomic harms caused by the District and to equitable relief in the form of compensatory education. Id. at 12-18.

In response to K.K.'s motion for summary judgment, the District makes numerous arguments. It contends that K.K.'s motion should be denied because the evidence of record does not establish that it was medically necessary for S.K. to attend Child's Way, and absent such evidence, it was not required to provide a modification of its transportation policy to transport S.K. between the day care center and his school. Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J. at 3-4, ECF No. 84 at 3-4. In support of this position, the District argues that there is no evidence that K.K. submitted any applications to day care facilities inside the District's boundaries, Ms. Colvin of Child's Way stated that home nursing care was an option for S.K., although Child's Way was a better option, Dr. Kilpela indicated in his letter that there were not any day care facilities in the District that either had openings or were able to meet S.K. needs, and that it is undisputed that K.K. wanted S.K. to attend Child's way "merely as a convenience" to K.K. because of a change in her employment schedule. Id.

Defendant argues that even if it was required pursuant to 28 C.F.R. § 35.130(b)(7) to provide a modification of its transportation policy, the evidence of record shows that modification would have placed an undue financial burden on the District and fundamentally

altered the nature of its transportation program.  Id. at 4.  Therefore, it did not have to modify the program to transport S.K. between Child's Way and the WPSB.  Id. at 5.  In support of this argument, the District cites to Ms. Maximo's Supplemental Unsworn Declaration wherein she stated: (1) the District would have incurred additional time and expense for the additional twenty-five minutes it would have taken to transport S.K. between Child's Way and the WPSB; (2) medically fragile students A and B (and their respective nurse and aide) would have been in the van additional time; and (3) the cost to the District for Shaler to transport S.K. as requested by K.K. would have been an additional $70-$72 a day.  Id. at 4-5 (citing Supp. Unsworn Decl. of Ms. Maximo, ECF No. 75-2).[5]

The District contends that it did not have to provide K.K. with the reasons for its decision not to modify the policy to transport S.K. between Child's Way and the WPSB.  Id. at 4.  "[I]t is only relevant that such considerations were given by the District in making its decision" and Ms. Maximo's Supplemental Unsworn Declaration support that such considerations were given.  Id.

Finally, the District argues with respect to K.K.'s claims for damages: (1) the court should follow the line of cases that hold that damages for emotional distress are not available for violations of the Rehabilitation Act or ADA; (2) K.K. failed to establish that the District deliberately failed to satisfy its duty to act in response to her modification request, and therefore, cannot prove that it acted with deliberate indifference as required to recover compensatory damages; and (3) K.K. lacks standing to be awarded equitable relief in the form of compensatory education for S.K..  Id. at 5-7.

In reply, K.K. argues that the District cannot have made a meaningful individualized inquiry into her requested modification of its transportation policy since it did not engage in a

_____
[5]On November 16, 2016, K.K. filed a motion to exclude the supplemental unsworn declaration.  ECF No. 81.  On December 13, 2016, K.K. withdrew her motion to exclude.  ECF No. 91.

dialogue with her concerning possible accommodations. Pl.'s Reply Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. at 2 (citing Wagner, 49 F.3d at 1009), ECF No. 83 at 2. "Even if the statements contained in Ms. Maximo's Declaration are true, the record is still devoid of any indication that the District engaged in a meaningful dialogue with K.K." Id. Therefore, "[t]he District's failure to discuss possible accommodations with K.K. is discrimination." Id.

K.K. replies that summary judgment should be granted in her favor because: (1) the District failed to demonstrate why paying Shaler seventy dollars a day would amount to an undue financial burden or why an additional twenty-five minutes of travel time per day would have been unduly burdensome; and (2) the District cannot argue that an accommodation would fundamentally alter the nature of its transportation program where the program is intended to assist parents by transporting students between school and day care facilities. Id. at 3. K.K. concludes, "[i]n the alternative, if the statements contained within the Maximo Declaration are taken as true, they do not alone establish that a reasonable accommodation would have posed an undue financial or administrative burden. At best, this would create a triable issue of fact." Id. at 4.

### 1. Liability.

Contrary to the District's contention, there is no genuine issue of material fact with respect to whether it was medically necessary for S.K. to attend a day care facility outside the District's boundaries. The evidence of record includes: (1) Ms. Colvin's statement that home care was an option for S.K. although Child's Way was a better option; (2) Dr. Kilpela's letter explaining how Child's Way was able to provide S.K. the medical care he needed; and (3) K.K.'s testimony at her deposition about the phone calls she and her ex-husband made to day care centers in the District and the varied reasons for why they were told no day care facilities within

the District's boundaries were able to accommodate S.K.'s needs, none of which was that although the day care was able to care for S.K. from a medical standpoint, that it did not have any openings. Viewing that evidence in a light most favorable to the District as the nonmoving party, a reasonable factfinder could only conclude that it was medically necessary for S.K. to attend a day care facility outside the District's boundaries. See ECF No. 71-3 and ECF No. 73 at 38-43.

Turning to the District's conduct that K.K. states to be discriminatory, while it is a close call, the court finds that a reasonable jury could find that the District engaged in an adequate individualized inquiry of K.K.'s request for a modification of the District's transportation policy when, after K.K. made her request, the District inquired into: (1) the time it would take to transport S.K. between Child's Way and the WPSB on a District vehicle and the effect of this additional time on the two medically fragile students who would be on the vehicle with S.K.; and (2) having Shaler provide the transportation requested, which was an option, at a cost of $70-$72 a day.[6]

As stated *supra*, the Third Circuit Court of Appeals has explained that a public entity need not accommodate one's disabilities if such accommodation imposes an "undue burden" or requires a "fundamental modification" of the entity's program. Easley, 36 F.3d at 30. If, however, "there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or undue burden," then a public entity's

---

[6]While K.K. does not use the term "interactive process," to the extent that her argument is that the District was required to, and did not, engage in an interactive process with her concerning possible modifications to its transportation policy, the court did not find case law that supports this contention. See Clemons v. Dart, 168 F.Supp.3d 1060, 1071 (N.D. Ill. 2016), *remanded on other grounds by* No. 16-3452 (7th Cir. Feb. 9, 2017) ("[plaintiff's] claim is governed by Title II of the ADA, which contains no 'interactive process' requirement") (citing 42 U.S.C. § 12132); Meeks v. Schofield, 10 F.Supp.3d 774, 791 (M.D. Tenn. 2014), *aff'd*, 625 F. App'x 697 (6th Cir. 2015) (explaining "the interactive process pertains to employment-related ADA claims, not to Title II ADA claims.").

failure to reasonably accommodate an individual's disability violates the ADA. Id.; Wagner, 49 F.3d at 1009. Given the evidence adduced about the burden on the other medically fragile students involved if the District transported S.K. between Child's Way and the WPSB in a District vehicle with these students, as well as the $70-$72 daily cost to the District to have Shaler transport S.K. between the day care facility and school, the court cannot say that as a matter of law a reasonable jury would find that K.K.'s proposal would not require a fundamental modification or cause an undue burden on the District. For these reasons, K.K.'s motion for summary judgment with respect to liability also will be denied.

### 2. Damages.

Concerning damages, K.K. contends that the District discriminated against her with deliberate indifference such that she is entitled to an award of compensatory damages. K.K. can only recover compensatory damages if she can prove that the District's discrimination was intentional. S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 262 (3d Cir. 2013); Henry for M.H. v. Lane, Civ. No. 16-1239, 2017 WL 1179012, at *7 (W.D. Pa. Mar. 30, 2017). A showing of deliberate indifference satisfies the intentional discrimination standard, and to satisfy this standard, a plaintiff must prove: "(1) knowledge that a federally protected right is substantially likely to be violated ..., and (2) failure to act despite that knowledge." D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 269 (3d Cir. 2014) (citations omitted). The defendant must have acted with "deliberate choice, rather than negligence or bureaucratic inaction," but "a showing of personal ill will or animosity toward the disabled person" is not required. Id. (citations omitted). Viewing the record evidence as a whole, the court concludes that a reasonable jury could find that the District's conduct with respect to K.K.'s request that it modify its transportation program and transport S.K. between Child's Way and the WPSB was not

deliberately indifferent, but instead was the result of "negligence or bureaucratic inaction." Id. K.K.'s motion for summary judgment with respect to compensatory damages, therefore, is denied.[7] This issue will be able to be raised at trial.

K.K. also seeks equitable relief in the form of compensatory education for S.K. ECF No. 66 at 18. K.K. does not cite, however, and the court could not locate, any decisions in which compensatory education was awarded in an associational discrimination case. The equitable remedy of compensatory education is designed to provide relief where a defendant's action has caused a student to be deprived of his or her right to a free appropriate education, i.e. it requires a school district to pay educational expenses it should have paid in the first place. M.C. on behalf of J.C. v. Central Regional School Dist., 81 F.3d 389, 395 (3d Cir. 1996). At no time in this case did the District refuse to educate S.K. Therefore, awarding K.K. compensatory education for S.K. is not an appropriate remedy for the District's discriminatory actions against K.K. K.K.'s motion for summary judgment for an award of compensatory education for S.K. is denied.

**IV. Conclusion.**

For the reasons set forth above, the District's motion for summary judgment (ECF No. 61) and K.K.'s motion for summary judgment (ECF No. 65) will be denied.

An appropriate order follows.

By the court:

s/Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated: June 27, 2017

---

[7]In light of this conclusion, it is not necessary to address the legal issue of whether under Title II of the ADA and section 504 of the Rehabilitation Act, a plaintiff is entitled to noneconomic compensatory damages for any emotional distress suffered as a result of a defendant's intentional discriminatory conduct.